STATESVILLE FLOUR MILLS COMPANY v. WAYNE DISTRIBUTING
COMPANY.

(Filed 10 May, 1916.)

1. Contracts—Breach—Independent Terms—Damages.

Whether covenants or stipulations of a contract are dependent upon or independent of each other is to be determined by the intention of the parties as gathered from the instrument; and a breach by one party of a term thereof does not necessarily relieve the other party from performance;

for the term thus violated, to have this effect, must be vital to the contract, making performance impracticable, as to the other parts of the contract, to accomplish the intended purpose; when it is otherwise, compensation may be demanded for the particular damage thereby caused.

**2. Same—Disputed Items—Adjustment—Vendor and Purchaser.**

In an action to recover damages for a breach of contract for the sale of flour it appeared that the defendant purchased the flour, to be sent out upon his notification and to pay certain "carrying-over charges" if not ordered out by him in stated quantities at certain periods. A dispute arose between the parties as to the amount of certain "carrying-over charges" the defendant should pay, and afterwards plaintiff acceded to his demands and, in accordance with custom, authorized the defendant to deduct the amount from the amount of the next invoice, and gave him credit therefor on the balance then due by him. *Held*, the defendant was not justified in refusing to perform his part of the contract on the ground stated, and was liable for the consequent damages incurred by plaintiff.

**3. Vendor and Purchaser—Price Delivered—Milling in Transit—Custom—Credits—Evidence—Contracts.**

Under a contract for the purchase of a quantity of flour at a price delivered, to be shipped out in car-load lots within a stated period as designated by the purchaser, the purchaser was to pay the freight and deduct it from the invoice of the next shipments, but breached his contract by refusing to accept the flour after the first shipment. The seller shipped the flour from a western point to Goldsboro, N. C., under a milling-in-transit arrangement at S., by which the freight for the whole transit was paid by the shipper, and in his action for the price of the flour it is held that the purchaser was not entitled to deduct therefrom the freight from S. to destination, as the contract contemplated actual shipments, and the freight was paid by plaintiff under the milling-in-transit arrangement with the railroad company, and, therefore, no freight was due at Goldsboro.

**4. Vendor and Purchaser—Price Delivered—Contracts—Breach—Measure of Damages.**

In an action by the seller of flour at a certain price delivered, for the breach of defendant's contract to accept it, the measure of damages is the difference between the contract price and the market price at the place of delivery.

CIVIL ACTION tried before *Ferguson, J.,* and a jury, at August Term, 1915, of IREDELL.

Plaintiff sued for the recovery of damages for the breach of a contract for the sale and purchase of 500 barrels of flour. The defendant contracted with the plaintiff to buy from it 500 barrels of flour to be delivered to defendant free on board the cars at Goldsboro, N. C., under the milling-in-transit freight rates granted to the plaintiff by the railroads, the flour to be delivered during the months of February and March, 1915, at such times and in such quantities as the defendant might specify, for which the defendant agreed to pay in cash upon the presentation of a sight draft with bill of lading attached, as a basic price, the sum

of $7.75 per barrel for the grade of flour manufactured by the plaintiff and branded as Queen, and $7.90 per barrel for the grade of flour manufactured by the plaintiff and branded as Palace. It was further agreed that if the flour was not ordered out within the contract shipment period, that is, during February and March, 1915, defendant would pay the plaintiff, in addition to the price of the flour and at the beginning of each thirty-day period after the said contract shipment period, without notice from the plaintiff, 5 cents per barrel per month or fraction of a month, which was the usual "carrying-over charge."

The first order, which was for 100 barrels, was not made by defendant until April, 1915, after the expiration of the "shipment period," and defendant was chargeable, in addition to the price, with 5 cents per barrel as "carrying-over charges." The 100 barrels were shipped to and received by the defendant at Goldsboro, and an invoice of the shipment mailed by the plaintiff to it, in which there was an overcharge of $7.50 for "carrying-over charges." There was correspondence in regard to the discrepancy between the parties, 29 April, 30 April, 6 May, 8 May, and 11 May, the substance of it being that defendant called attention to the error and plaintiff replied that 25 barrels were shipped in April on a January contract, which entitled it to two months for carrying-over charges or 10 cents per barrel, and that there were charges for two months on the 100-barrel shipment. Defendant insisted that there was a mistake, and drew for the difference, which was $7.50. Plaintiff replied on 8 May that it was charging all customers 10 cents per month, but that it would credit defendant's account with $7.50, to be deducted from the next invoice. On 11 May defendant canceled the contract and refused to receive any more shipments. At that time defendant sued plaintiff for carrying-over charges more than $7.50. The defendant claimed a deduction for freight from Statesville to Goldsboro, and with reference to this claim F. A. Sherrill, witness for the plaintiff, testified: "The contract shipment period is the period within which it is to be ordered out on which there is no carrying charges, to wit, February and March. The defendant ordered out 28 April, 1915, 100 barrels; that left 400 barrels due on order. The defendant never ordered out the other barrels, but repudiated and rescinded the contract 11 May, 1915; the market price of the flour in Goldsboro then (11 May, 1915) was $7.10 for Palace and $6.95 for Queen; this is 15 cents lower than stated in the complaint. I overlooked the fact that Goldsboro was a less rate than some contracts we had (freight rate). We base all our prices of flour on the Ohio River Crossing; for instance, some points will be 50, some 60, and others 65 cents. Flour is all sold delivered; the seller pays the freight and it is deducted from the invoice. We will say flour is $5 at Goldsboro, we deliver it there; it is c. a. f., cash and freight. We

deduct the freight from price of flour. The price of flour is based on delivered shipments, including the freight, the price per barrel."

B. C. Thaxton, witness for defendant, testified: "On the invoice sent to us they deducted the freight. They were to deliver it in Goldsboro, and they drew for the amount of the invoice, less the freight. On the Queen I was to pay $7.75, less the freight. They made it that much less." There was evidence on the issue as to damages which showed the difference between the contract price and the market price or value of the flour at Goldsboro. The jury returned the following verdict:

1. Was there a breach of the contract by the defendant 11 May, 1915? Answer: "Yes."

2. What damage has the plaintiff sustained by reason of the breach? Answer: "$272.50."

Judgment on the verdict and appeal by defendant.

*A. L. Coble and Dorman Thompson for plaintiff.*
*D. H. Bland and W. D. Turner for defendant.*

WALKER, J., after stating the case: The defendant contends that the plaintiff broke the contract by overcharging on one item as indicated in the above statement. It is plain, we think, that if this was a breach at all, it was not such a one as justified the defendant in canceling the contract. It seems to have been the result of a misunderstanding as to the nature of the shipments, and as soon as plaintiff discovered its mistake, in a very small amount, it agreed to rectify it, by giving the defendant credit for the amount, with leave to deduct it from the next invoice. What else could plaintiff have done? Defendant then owed it more than enough to cover the amount of the discrepancy and was fully protected, had plaintiff been insolvent, and was doubly protected if it had complied with the contract, as it had the right and the express permission to deduct the amount from the next invoice. Why the defendant should have drawn for the amount, when it was indebted to the plaintiff in a larger amount, requires more explanation than has been given. But upon well settled legal principles the defendant was in the wrong, apart from the question of good faith, in canceling the contract. The doctrine is well expressed in 9 Cyc., p. 650: "When there are several terms in a contract, a breach committed by one of the parties may be a breach of a term which the parties have not, upon a reasonable construction of the contract, regarded as vital to its existence. Such a term is said to be subsidiary, and a breach thereof does not discharge the other party. He is bound to continue his performance of the contract, but may bring an action to recover such damages as he has sustained by the default." In a case much cited on this point it appeared that the plaintiff, a professional singer, had entered into a contract with defendant, director of

an opera, for his services as a singer for a considerable time, and upon a number of terms, one of which was that plaintiff should be in London without fail at least six days before the commencement of his engagement, for the purpose of rehearsals. Plaintiff broke this term by arriving only two days before the commencement of the engagement, and defendant treated this breach as a discharge of the contract. The Court held that, in the absence of any express declaration that the term was vital to the contract, it must look to the whole contract and see whether the particular stipulation goes to the root of the matter, so that a failure to perform it would render the performance of the rest of the contract by the plaintiff a thing different in substance from what the defendant has stipulated for; or whether it merely partially affects it and may be compensated for in damages, and the Court held that the term did not go to the root of the matter, so as to constitute a condition precedent. *Betini v. Gye*, 1 Q. B. D., 183." To the same effect, Clark on Contracts, 457; 3 Elliott on Contracts, sec. 2045, and 3 Page, sec. 1450, where the rule as to divisible and subsidiary promises is thus stated: "It is not the breach of every covenant of a contract that may operate as a discharge of the adversary party. To have this effect, the covenant broken must be a vital term of the contract, breach of which makes performance impracticable, and the accomplishment of the purpose of the parties impossible. Breach of a minor and subsidiary covenant may give rise to an action for damages, but it cannot operate as a discharge." And again, in the same section: "Where a contract to ship goods under the vendee's form of charter party is broken only by using another form of charter party which omits a clause that if the vessel is freed from wharfage during discharge of cargo, freight is to be reduced 4½ pence per ton, the party not in default must perform, and sue for damages if he has suffered any." *Withers v. Moore*, 71 Pac. (Cal.), 697. Another apt illustration, where the facts were similar to those before us, will be found in 3 Elliott on Contracts at sec. 2046, it being there said: "Neither is there a fatal breach in cases where the nonperformance of one of the conditions does not materially impair the benefit from the performance of the others and the loss occasioned by the breach of the particular condition is capable of compensation in damages. It is not the theory of this principle that on failure of performance in an unimportant particular that the party benefited should enjoy these benefits and render no compensation for them. This principle is abundantly illustrated in cases where contractors for construction of buildings have, in good faith, substantially but not literally complied with the specifications. In these cases where the damages are slight, so that an allowance out of the contract price will give the owner substantially what he contracted for, the breach does not discharge the entire contract." As remarked by

*Tindal, C. J.,* in *Stavers v. Curling,* 3 Bing., N. C., 355, the rule has been established by a long series of decisions in modern times, that the question whether covenants or stipulations of a contract are to be held dependent upon or as independent of each other is to be determined by the intention of the parties as it appears on the instrument, and by the application of common sense to each particular case, and to this intention, when once discovered, all technical forms must give way. See *Leonard v. Dyer,* 26 Conn., 172; *Ritchie v. Atkinson,* 10 East, 295, and numerous authorities cited in notes to text-books which we have cited.

The defendant received proper credit for the overcharge in this case, and this was all that he could reasonably demand. *Withers v. Moore, supra.*

It would be contrary to reason and a reproach to the administration of justice if for so slight a breach, if substantial breach it was, we should hold the defendant to be altogether discharged from further performance of this contract.

The parties may by their language make a term have the force and effect of a condition precedent, but there is no such expression in this contract.

The determination of the other question, as to the deduction from the damages of the amount of the freight for carriage from Statesville to Goldsboro, it seems to us, must also and equally be against the defendant. It is perfectly evident what the parties meant by the stipulation as to freight, which was to be deducted from the invoices of *actual* shipments. "The price of flour was based on delivered shipments, including freight, the price per barrel. . . . Flour is all sold delivered; the seller pays the freight and it is deducted from the invoice," said plaintiff's witness. The defendant's testimony does not contradict this statement, but rather tends to corroborate it. B. C. Thaxton said that "On the invoice sent they deducted the freight; they drew for the amount of the invoice, less the freight." This meant nothing more or less than that when a shipment was made and the goods were actually transported, where there would be freight charged, the plaintiff should pay the freight to Goldsboro, and the amount should be taken from the total of the invoice. There would be no freight where there was no shipment, and, of course, no invoice to be deducted from. The reason plaintiff allowed this credit on the amount of the invoice was because it had already paid the freight through Statesville to Goldsboro, and the railroad company would refund to plaintiff the amount so paid for defendant under the "milling-in-transit" arrangement, which is well understood, and is fully explained in the evidence. Any other construction of the contract would plainly contravene the real intention of the parties, and might result in a sale of the flour below the market price.

The court gave proper instructions as to the measure of damages: the difference between the contract price and the market price at the place of delivery. *Heiser v. Mears,* 120 N. C., 443; *Clements v. State,* 77 N. C., 142; *Hosiery Co. v. Cotton Mills,* 140 N. C., 452, 454.

We find no error in the record.